# Hofkin v. Whitemarsh Township Zoning Board of Adjustment

*Knox Henderson,* for appellants.

*Clarke Hess,* for appellee.

GROSHENS, P. J., April 6, 1967.—This is an appeal from the refusal of the Whitemarsh Township Zoning Board of Adjustment to grant a variance to permit the erection of three six-story apartment buildings on appellants' tract of 17.8 acres of land.

The tract in question is located along the westerly side of Thomas Road about 1,000 feet north of its intersection with Germantown Pike, opposite the extensive and well-maintained grounds of the Whitemarsh Valley Country Club. The tract is the sole remaining undeveloped portion of an area of approximately 175 acres purchased by appellants between 1954 and 1958, which has been developed by appellants for suburban residential use and which has been improved by them by the construction of about 150 single family houses, ranging in value from $30,000 to $45,000 known as Whitemarsh Valley Farms.

The tract in question is in the lowest part of the Whitemarsh Valley Farms and of the entire watershed west of Thomas Road comprising approximately 440 acres. Consequently, it is subjected to large quantities of surface waters, which are trapped by the dike-like Thomas Road until they slowly flow through the grossly inadequate drainage facility under Thomas Road into the water course on the grounds of the Whitemarsh Valley Country Club, and thence into the nearby Wissahickon Creek.

The Whitemarsh Valley Farms tract, including the 17.8 acre tract in question, was zoned in its entirety "AA Residential District", prior to the enactment of Ordinance no. 183 (hereinafter referred to as the "flood plain ordinance") on November 11, 1965.

The effect of the enactment of the flood plain ordinance was to place a portion of the tract in question in a "Flood Plain Conservation District". Appellants contend that the flood plain ordinance is unconstitutional in a number of respects, at least as the regulations apply to their tract. With this latter contention, we agree.

An examination of the terms of the flood plain ordinance, an overlay of these regulations upon the tract in question, and a study of the impact of these regulations on the natural and man-made physical characteristics of the tract reveal that what is attempted under the guise of the police power is, in reality, the exercise of the power of eminent domain without compensation for the taking and, therefore, unconstitutional.

The preamble recites that the "Whitemarsh Township Zoning Ordinance of 1957—Revised" is amended and supplemented by adding article XXIII, entitled "The Flood Plain Conservation District", which, in section 2300, sets forth in general terms the purposes to be achieved, namely: "to protect areas of flood plain

. . . which are subject to and necessary for flood waters, and to permit and encourage the retention of open land uses which will be so located and designed as to constitute a harmonious and appropriate part of the physical development of the municipality as provided for in the Comprehensive Plan".

Section 2300 then enumerates seven categories of "specific intent" which embrace a wide variety of intentions to "combine", "prevent", "minimize", "reduce", "permit" and "provide" in relation to all phases of surface water drainage and kindred problems. This elaborately detailed expression of intent reveals a paramount intent that open spaces are to be maintained in Whitemarsh Township in areas defined as "Flood Plain Conservation District".

The definition of "Flood Plain Conservation District" set forth in section 2301 is based on two criteria. The first criterion is "the low area adjoining and including any water or drainage course or body of water subject to periodic flooding or overflow and delineated as alluvial soils by the Soil Conservation Service, United States Department of Agriculture, in the Soil Survey of Montgomery County, 1960-1963,. . . ." It is under this criterion that the tract in question is zoned in part as a "Flood Plain Conservation District".

In the following section are enumerated the permitted uses of such districts. They are:

"1. Cultivation and harvesting crops according to recognized soil conservation practices.

"2. Pasture, grazing land.

"3. Outdoor plant nursery.

"4. Recreation use such as: park, day camp, picnic grove, golf course, hunting, fishing and boating club, excluding structures.

"5. Forestry, lumbering and reforestation, excluding storage and mill structures.

"6. Harvesting of any wild crops such as marsh hay, ferns, moss, berries or wild rice.

"7. Game farm, fish hatchery (excluding rearing structures) hunting and fishing reserves.

"8. Wildlife sanctuary, woodland preserves, arboretum.

"9. Outlet installations for sewage treatment plants, sealed public water supply wells.

"10. Utility transmission lines".

We have carefully studied the record, including the exhibits, and we have personally inspected the tract in question. In our opinion, the agricultural and kindred uses permitted are utterly impractical and completely profitless. The hunting and fishing uses permitted on this tract, and particularly "a boating club", approach the fantastic. The only practical, but profitless, permitted uses of the land are "park" and "wildlife sanctuary". The profitable and practical permitted use for "sealed public water supply wells" is probably rendered impractical for this tract by reason of the nearby facility of the Philadelphia Suburban Water Company. The permitted use for "utility transmission lines" may have some practicable and profitable application to the tract.

The "Declaration of Legislative Intent" (section 2300) ". . . to permit and encourage the retention of open land uses . . ." is certainly achieved when the "Permitted Uses" (section 2302) are applied to the tract in question.

To prevent any impairment of the "Declaration of Legislative Intent", by variance or special exception, a unique prohibition is imposed in section 2303 entitled "Specifically Prohibited Uses", as follows:

"Notwithstanding the rule that any use not permitted is prohibited, for the guidance of the Zoning Board and Administrative Officers, it is deemed appropriate to state that certain specific uses are so re-

pugnant to the purpose of establishing and maintaining the Flood Plain Conservation District that such uses shall not be permitted.

"The specifically prohibited uses are:

"4. The erection of any building or structure whatsoever except for dams, culverts and bridges which have been approved. . . ."

The "Uses by Special Exception" provided in section 2304 permit no practical use of this tract by appellants, and do little or nothing to ameliorate the impact of these Draconian regulations upon their land.

Finally, to ensure the sanctity of "open land uses" and to render the "Declaration of Legislative Intent" inviolate, it is provided in section 2305 that:

"Notwithstanding the provisions of this or other sections of this Zoning Ordinance of this Municipality, the Zoning Officer shall not issue a permit for any structure within a distance of 100 feet from the Flood Plain Conservation District and shall not approve any plans for the development of a recreational or utility use within or adjacent to the Flood Plain Conservation District, until the Board of Supervisors has made a determination in favor of such proposed use".

The "flood waters" which create the drainage problems upon the tract in question are due to two factors: one natural, and the other man-made. A small tributary to the Wissahickon Creek, which flows through appellants' land, forms the natural drainage course for a watershed of approximately 450 acres. The extensive residential development of the watershed has, by paved roads, driveways and buildings, greatly increased the rate and volume of the run-off of surface waters. Such a result is inevitable where extensive impervious surfaces replace the permeable grassy turf of field and leafy humus of woodland. The flooding which overburdens the rill is worsened by inadequate and ineffective drainage facilities across the tract and

under Thomas Road. Two 40-inch by 65-inch steel pipes direct surface waters to the tract from Pine Tree Road (another part of appellants' development and a part of the 440 acre drainage basin). They flow across the tract through the small, easily-surcharged water course, which discharges through two 30-inch steel pipes under Thomas Road to the wholly adequate water course across the grounds of the Whitemarsh Country Club. Common sense dictates that the discharge pipes should at least be equal in capacity and effectiveness as the intake pipes. The photographic exhibits show gross flooding west of Thomas Road on the tract in question, and no flooding east of Thomas Road on the golf links. The conclusion is inescapable that the key to the flooding problem lies under Thomas Road. It is equally clear that if alluvial soil deposits are found west of Thomas Road, the dike formed by the road bed for many generations has contributed substantially to the formation of the deposits.

The "Declaration of Legislative Intent" recites that the enactment is intended to protect areas of flood plain "In the interest of the public health, safety and welfare. . . ." It is difficult to discern any protection to the public health and safety. We cannot see any way in which the residential development would endanger public health or impair public safety. The entire area is served by a public water system and by public sanitary sewers. Neither on-site sewage disposal systems nor wells would be relied upon. Any threat to life or property by periodic floods could be quickly and effectively eliminated by piping the small stream across the tract to a properly designed culvert at Thomas Road, and by some regrading of the tract, which is entirely feasible.

It cannot be denied that "open land" such as a "park" or "wildlife sanctuary" may promote "welfare", and to this extent the flood plain ordinance, as

applied to appellants' land, achieves a lawful purpose, albeit an unlawful method.

We, therefore, have no hesitation in holding that the excessive regulations and prohibitions of the flood plain ordinance are so restrictive and confiscatory, when applied to appellants' tract, that they are tantamount to the exercise of the powers of eminent domain. They effectively exclude any type of structure upon the land, or any practical use of the land designated "Flood Plain Conservation District". They (the excessive regulations and prohibitions) render the flood plain in question completely profitless and, therefore, of little or no value in the hands of private owners, such as appellants.

Under the present zoning classification, i.e. "Flood Plain Conservation District" and "AA Residential District", it is possible to erect as many as nine residences on the tract with no zoning changes. Our holding that the flood plain ordinance is invalid in its specific application to appellants' tract causes that part of the tract to revert to "AA Residental District", so that the entire 17.8 acres is zoned as it was before the enactment on November 11, 1965.

We shall now turn to the variance phase of this appeal.

Does "AA Residential District" zoning, when applied to the tract in question, create such an unnecessary hardship as to entitle appellants to a variance to permit the erection of three six-story apartment buildings?

The board of adjustment answered this question in the negative. There is nothing in the record or the briefs of counsel which would warrant the court to hold that the board of adjustment was guilty of a manifest abuse of discretion, or an error of law, which it must do in order to reverse the board: Jacobi v. Zoning Board of Adjustment, 413 Pa. 286 (1964). The

board has adequately and correctly considered the questions of variance and hardship on pages 7 to 9 of its "Decision", and it would serve no useful purpose to review or to enlarge upon that able discussion in the record.

ORDER

And now, April 6, 1967, the order of the Board of Adjustment of Whitemarsh Township dated April 11, 1966, is affirmed.